**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CAUSE OF ACTION INSTITUTE,                    )
1875 Eye Street, N.W., Suite 800              )
Washington, D.C. 20006,                       )
                                              )
        Plaintiff,                            )    CIVIL ACTION NO. 16-cv-00871
                                              )
        v.                                    )
                                              )
W. NEIL EGGLESTON, in his official            )
capacity as White House Counsel               )
1600 Pennsylvania Avenue, N.W.                )
Washington, D.C. 20500,                       )
                                              )
OFFICE OF THE WHITE HOUSE                     )
COUNSEL                                       )
1600 Pennsylvania Avenue, N.W.                )
Washington, D.C. 20500,                       )
                                              )
INTERNAL REVENUE SERVICE                      )
1111 Constitution Avenue, N.W.                )
Washington, D.C. 20224,                       )
                                              )
UNITED STATES DEPARTMENT OF                   )
DEFENSE                                       )
1400 Defense Pentagon                         )
Washington, D.C. 20301,                       )
                                              )
ENVIRONMENTAL PROTECTION                      )
AGENCY                                        )
1200 Pennsylvania Avenue, N.W.                )
Washington, D.C. 20460,                       )
                                              )
UNITED STATES DEPARTMENT OF                   )
INTERIOR                                      )
1849 C Street, N.W.                           )
Washington D.C. 20240,                        )
                                              )
UNITED STATES DEPARTMENT OF                   )
ENERGY                                        )
1000 Independence Avenue, S.W.                )
Washington, D.C. 20585,                       )
                                              )
_____              )

UNITED STATES DEPARTMENT OF           )
HEALTH AND HUMAN SERVICES             )
200 Independence Avenue, S.W.         )
Washington, D.C. 20201,               )
                                      )
UNITED STATES DEPARTMENT OF           )
HOMELAND SECURITY                     )
245 Murray Lane, S.E.                 )
Washington, D.C. 20528,               )
                                      )
UNITED STATES DEPARTMENT OF           )
JUSTICE                               )
950 Pennsylvania Avenue, N.W.         )
Washington, D.C. 20530,               )
                                      )
UNITED STATES DEPARTMENT OF           )
STATE                                 )
2201 C Street, N.W.                   )
Washington, D.C. 20520,               )
                                      )
UNITED STATES DEPARTMENT OF           )
TRANSPORTATION                        )
1200 New Jersey Avenue, S.E.          )
Washington, D.C. 20590,               )
                                      )
UNITED STATES DEPARTMENT OF           )
THE TREASURY                          )
1500 Pennsylvania Avenue, N.W.        )
Washington, D.C. 20220, and           )
                                      )
              Defendants.             )
                                      )
                                      )
                                      )
                                      )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## NATURE OF ACTION

1.      The Freedom of Information Act ("FOIA"), by creating a private right to request documents from federal agencies and to seek judicial remedies when agencies fail to comply, provides a statutory means to ensure that the regulatory operations of the federal administrative state will be open and transparent.  Plaintiff Cause of Action Institute ("CoA Institute"), a nonprofit organization dedicated to ensuring the transparency and accountability of federal administrative agencies, relies on FOIA and files dozens of FOIA requests with federal agencies every year.

2.      On April 15, 2009, then-White House Counsel Gregory Craig issued, from the Office of White House Counsel ("OWHC"), a non-published memorandum to the general counsel of all federal agencies that effected a change in all agency FOIA processes.  The memorandum "reminded" general counsel of federal agencies to consult with the White House concerning requests for documents, including FOIA requests, "that may involve documents with White House equities."  Ex. 1 (the "Craig Memo").  The Craig Memo stated in part:

> This is a reminder that executive agencies should consult with the White House Counsel's Office on all document requests that may involve documents with White House equities.  We ask that such consultation take place well in advance of the deadline for responding.

> This need to consult with the White House arises with respect to all types of document requests, including Congressional committee requests, GAO requests, judicial subpoenas, and FOIA requests.  And it applies to all documents and records, whether in oral, paper, or electronic form, that relate to communications to and from the White House, including preparations for such communications.

> *Id.*

The Craig Memo concludes with the comment: "We will respond to your requests promptly."  *Id.*

3.      The agencies have complied with the Craig Memo, as confirmed by internal documents uncovered by CoA Institute, public statements from administration officials, and administration testimony before the United States House of Representatives Committee on

Oversight and Government Reform (the "Oversight Committee").  Agencies apply it broadly.

They seek White House approval before producing even innocuous documents because such

documents may mention the White House, or refer to a meeting or communication that occurred

there.  Agencies also seek White House permission to produce documents that the administration

may consider politically sensitive and/or potentially embarrassing.

4.      Pre-production clearance of FOIA productions by the White House is a departure

from past FOIA practices; the current practice that causes delay is not supported by statutory or

other authority.  When the White House is slow to respond, the parties filing the FOIA requests

must wait.  This delays final determination on FOIA requests and the prompt production of

responsive documents far past FOIA statutory deadlines.

5.      CoA Institute has made several FOIA requests for production of documents to

several federal agencies that have been or will continue to be delayed due to the "White House

equities" review practice.  As an example, in August 2013, CoA Institute filed a FOIA request for,

among other things, the work calendars of various officers of the Department of Health and Human

Services ("HHS").  Six months later, HHS sent some records responsive to this CoA Institute

request to the White House for review, even though the requests should not have required White

House input. *See infra* ¶ 61.  Since then, CoA Institute has heard nothing further about its August

2013 request.

6.      Many other CoA Institute FOIA requests are overdue.  These include several July

29, 2015 requests for, *inter alia*, agency calendars and travel documents.  These requests concern

the types of documents that implicate "White House equities," the review of which results in

production delays and violations of FOIA.  Given the practice of agencies referring similar

responsive documents for White House review, such review is likely responsible, in part or in whole, for consequent agency violations of FOIA statutory deadlines.

7. Pre-production White House Counsel review is not necessary for FOIA purposes. When the President chooses to do it, and it causes production to stray beyond FOIA deadlines, it violates FOIA, constitutes arbitrary and capricious conduct under the Administrative Procedure Act ("APA"), and is *ultra vires* action by the White House.

8. This Complaint is limited. It is acknowledged that the President may require that agencies within the Executive Branch keep him informed of FOIA requests directed to them. The President may also require that agencies consult about production of White House documents or documents over which the President has statutory responsibility. The President may even require agency consultation more broadly. However, he may do so only as long as the public's timely right of access to documents is not infringed. The President may oversee the agencies in the Executive Branch, but his oversight does not extend to preventing such agencies from complying with mandated statutory deadlines to produce information. The President may not exercise powers that result in or compel a violation of FOIA statutory procedures and deadlines, or frustrate the FOIA purpose of federal transparency.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, including the Court's inherent power of nonstatutory review, and 5 U.S.C. §§ 552(a)(4)(B), (a)(6)(E)(iii).

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) and 5 U.S.C. § 552(a)(4)(B).

## PARTIES

11. CoA Institute is a nonprofit strategic oversight group committed to ensuring that government decision-making is open, honest, and fair. In furtherance of its public interest mission,

CoA Institute regularly requests access to the public records of federal government agencies, entities, and offices.  It disseminates its findings to the public.

12.     Defendant W. Neil Eggleston is the White House Counsel and is the official responsible for review of FOIA productions and proposed responses by the OWHC.  Mr. Eggleston is sued in his official capacity.

13.     The OWHC is the office of the President that has, since issuance of the Craig Memo, effected a review of agency FOIA productions which has resulted in violations of FOIA deadlines.  It has done this without statutory authority and has and will continue to cause violations of established FOIA and administrative processes and procedures, resulting in delays that prejudice timely FOIA production rights.

14.     HHS, the Internal Revenue Service ("IRS"), United States Department of Homeland Security ("DHS"), United States Department of Defense ("DOD"), United States Department of Energy ("DOE"), United States Department of Justice ("DOJ"), United States Department of State ("State"), Environmental Protection Agency ("EPA"), United States Department of the Interior ("DOI"), United States Department of the Treasury ("Treasury"), and United States Department of Transportation ("DOT") (collectively, the "Agency Defendants"), are each agencies within the meaning of 5 U.S.C. § 552(f)(1).  Each has possession, custody, and control of records to which CoA Institute sought, seeks, or will seek access and which are the subject of this Complaint.

**ALLEGATIONS**

**I.      THE FREEDOM OF INFORMATION ACT**

15.     FOIA provides a judicially enforceable right of prompt access to records of agencies of the Executive branch of the Federal government.  5 U.S.C. § 552.  Determinations concerning requests must occur within statutory timeframes, and documents may be withheld only

pursuant to certain specific, enumerated exceptions. Such rights ensure the "fundamental principle of public access" to information concerning the modern administrative state, information which may be "'shielded unnecessarily from public view … [by] possibly unwilling official hands.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973)).

### A.    The FOIA Request Process

16.    FOIA regulates, among other disclosures, requests for documents filed by members of the public with federal agencies. "Agency" is a defined term that includes "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency[.]" 5 U.S.C. § 552(f)(1). That definition has been interpreted to exclude "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 156 (1980) (citation omitted). The D.C. Circuit has held that OWHC is not an agency subject to FOIA. *Nat'l Sec. Archive v. Archivist of the U.S.*, 909 F.2d 541 (D.C. Cir. 1990).

17.    Under FOIA, a federal agency "upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules" and procedures, "shall make the records promptly available[.]" 5 U.S.C. § 552(a)(3)(A). An agency that receives such a request must "make reasonable efforts to search for the records in electronic form or format," except when doing so would "significantly interfere with the operation of the agency's automated information system." *Id.* § 552(a)(3)(C).

18.    FOIA establishes strict deadlines for agency responses. Within twenty working days after receiving a FOIA request, an agency must make a final determination of whether to

comply with the request and provide that determination to the requesting party.  *Id.* § 552(a)(6)(A)(i).  In that "determination," the "agency must at least (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents[.]"  *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013) ("*CREW*").

19.     The agency's twenty-day response deadline can be extended, but only under specific circumstances.

20.     First, the deadline may be statutorily "tolled" (a) if the agency reasonably requests additional information from the requester, 5 U.S.C. § 552(a)(6)(A)(ii)(I), or (b) "to clarify … issues regarding fee assessment."  *Id.* § 552(a)(6)(A)(ii)(II).  Statutory tolling is otherwise not permitted.  *Id.* § 552(a)(6)(A)(ii).

21.     Second, FOIA provides an extension of ten working days when there are "unusual circumstances" and the agency communicates these circumstances to the requester in writing with an estimated completion date.  *Id.* § 552(a)(6)(B)(i).  "Unusual circumstances" is a defined term, and applies in three specific situations where additional time is required.[1]  *Id.* § 552(a)(6)(B)(iii)(I)–(III).

22.     The only such situation arguably relevant here is inter-agency consultation.  FOIA provides a ten-working-day extension when there is a "need for consultation … with another agency having a substantial interest in the determination of the request."  *Id.* § 552(a)(6)(B)(iii)(III).  Consultation must be "conducted with all practicable speed," *id.*, and does not free the agency from its obligation to provide a response to the FOIA request in a timely

---

[1] If an agency does not expect that it will provide a determination within this extended timeframe, it must contact the requester "and provide the person with an opportunity to limit the scope of [the] request" or to arrange "an alternative time frame for processing the request or a modified request."  5 U.S.C. § 552(a)(6)(B)(ii).

manner.  In fact, such extension of time is allowed "only to the extent reasonably necessary to the proper processing of the particular requests."  *Id.* § 552(a)(6)(B)(iii).

23.     While the term "substantial interest" is undefined, such an interest is understood to exist either (a) where records "originate[] with another agency," Dep't of Justice, *Referrals, Consultations, and Coordinate: Procedures for Processing Records When Another Agency or Entity Has an Interest in Them* (last updated Aug. 15, 2014), *available at* http://goo.gl/qfsRhA, or (b) where another agency is "better able to determine whether [a] record is exempt from disclosure."  *See, e.g.*, 28 C.F.R. § 16.4(c) (describing Department of Justice FOIA procedures). Those two circumstances are the exclusive situations where consultation is appropriate.  Neither contemplates consultation with a non-FOIA agency such as OWHC.

24.     "As to actual production," the D.C. Circuit has explained that "FOIA requires that the agency make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years."  *CREW*, 711 F.3d at 188 (citations omitted).

25.     An agency failure to comply with FOIA statutory deadlines gives rise to an immediate right of judicial review upon expiration of statutory deadlines.  5 U.S.C. § 552(a)(4)(B) (conferring jurisdiction on federal district courts to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld").  When an agency fails for any reason to meet its deadlines, after accounting for statutory tolling and any applicable extension, the requester's administrative remedies are constructively exhausted and a cause of action accrues immediately.  *Id.* § 552(a)(6)(C)(i).  If agency compliance is not feasible because of "exceptional circumstances … the court may retain jurisdiction and allow the agency additional time to complete its review of the records[.]"  *Id.*  Such additional time, if any, is obtained by

presenting arguments to a Judge empowered under Article III of the United States Constitution and by suits authorized under the FOIA enabling statute, and not by a practice or procedure effected by a memorandum from OWHC.  The President cannot extend FOIA deadlines.

26.     Agencies subject to FOIA designate a "Chief FOIA Officer" who has "agency-wide responsibility for efficient and appropriate compliance" with FOIA.  *Id.* §§ 552(j), (k)(1).  The Chief FOIA Officers are supervised by the heads and chief legal officers of their agencies, and by the Attorney General.  *Id.* §§ 552(k)(2), (k)(4).

### B.     FOIA Exemptions

27.     Both Congress and the courts have recognized that a balance must be struck between the FOIA purpose of providing the public with information and the legitimate interest of the government and private parties in protecting certain categories of records.  To this end, FOIA contains statutory exemptions and exclusions for certain types of information.  *Id.* §§ 552(b)(1)– (9), (c)(1)–(3).

28.     Some of those exemptions relate specifically to Presidential determinations or records.  One exemption covers documents "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and [that] are in fact properly classified pursuant to such Executive order."  *Id.* § 552(b)(1).  In addition, documents subject to the Presidential communications privilege are generally treated as exempt from FOIA.  *E.g.*, *Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1113–14 (D.C. Cir. 2004) (citing 5 U.S.C. § 552(b)(5)).

29.     None of these specific exemptions permit agencies to withhold information on grounds of political expedience or potential embarrassment.  FOIA "limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the [statute's] dominant objective."  *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

## II.    THE CRAIG MEMORANDUM AND "WHITE HOUSE EQUITIES" REVIEW

30.    Given that the President and his immediate staff, including the OWHC, are not an "agency" within the meaning of FOIA, FOIA contains no provision governing review of agency FOIA productions by the White House.  It appears the President may review documents held by agencies within the Executive Branch of government absent a statutory prohibition or procedure on such review.  *See, e.g.*, 26 U.S.C. § 6103(g) (circumstances and procedures for Presidential review of individual tax returns).  However, the President cannot effect such review if it results in violations of statutory deadlines.

31.    Before the current administration took office, FOIA consultations between such agencies and the White House were guided by a November 3, 1993 Department of Justice memorandum to the FOIA administrative and legal contacts at all federal agencies.  *See* Memorandum from Associate Attorney General Webster L. Hubbell to all Agency General Counsels (Nov. 3, 1993), *available at* http://goo.gl/5BNWke ("Hubbell Memo").  The Hubbell Memo stated that agencies should consult with the White House on requests for documents that originated with the Executive Office of the President, the Office of Vice President, or other entities within the Executive Office of the President, and, in particular, "classified White House records or records originating with the National Security Council."  *Id.*

32.    President Obama entered office with the promise that "[t]ransparency and the rule of law will be the touchstones of [his] presidency" and stating that "[t]he Freedom of Information Act is perhaps the most powerful instrument we have for making our government honest and transparent, and of holding it accountable."  President Obama Delivers Remarks at Swearing-In Ceremony (Jan. 21, 2009), *available at* http://goo.gl/p97TwK.  In a memorandum issued the same day, President Obama declared that "the Freedom of Information Act (FOIA), which encourages accountability through transparency, is the most prominent expression of a profound national

commitment to ensuring an open Government.  At the heart of that commitment is the idea that accountability is in the interest of the Government and the citizenry alike."  Presidential Memorandum for Heads of Executive Departments and Agencies Concerning the Freedom of Information Act, 74 Fed. Reg. 4683 (Jan. 21, 2009).  The President has continued to state support for such transparency by, for instance, supporting the current bills in the House and Senate designed to improve FOIA procedures and transparency.

33.     Nevertheless, three months after President Obama lauded the importance of FOIA, his administration reversed course.

### A.     The Expansion of White House Involvement in Agency FOIA Responses.

34.     In an undisclosed April 2009 memorandum, President Obama's then-chief legal advisor, White House Counsel Gregory Craig, quietly, without public disclosure instructed all federal agency and department general counsel to consult with OWHC on all document requests that may involve "White House equities."  *See* Ex. 1 (Craig Memo).  The Craig Memo states that "[t]his need to consult with the White House arises with respect to all types of document requests, including Congressional Committee requests, GAO requests, judicial subpoenas, and FOIA requests."  *Id.*

35.     The administration has treated the Craig Memo as a departure from past practice. The Department of Justice Office of Information Policy, in a 2013 memorandum to the Office of Legal Counsel, stated that the Craig Memo "supersedes" the previous guidance of the Hubbell Memo.  Ex. 2 (Mallon Memo).

36.     Agency compliance with the Craig Memo direction is not in doubt.  As White House Press Secretary Josh Earnest stated in response to questions about State Department release of former Secretary Hillary Rodham Clinton's email, "where there are documents with White House equities that are prepared for release, White House officials will have an opportunity to see

them before they are released.  And that is standard operating procedure[.]"  Ex. 3 at 12 (Aug. 31, 2015 White House Press Gaggle).  On March 31, 2011, the House Oversight Committee held a hearing, where Mary Ellen Callahan, the Chief Privacy Officer for DHS, testified that "anything that has White House equities would require White House review" before being produced under FOIA.  *Why Isn't the Department of Homeland Security Meeting the President's Standard on FOIA?*, *Hearing Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. 33–34 (testimony of Mary Ellen Callahan, Chief Privacy Office, Dep't of Homeland Sec.).  A representative from the United States Department of Agriculture ("USDA") informed CoA Institute that it too complies with the Craig Memo.  Ex. 4.  And as discussed below, through an investigation of "White House equities," CoA Institute has gathered facts demonstrating that the other federal agencies are consulting with the White House pursuant to the Craig Memo, even when doing so serves no legitimate FOIA purpose and results in violations of FOIA statutory deadlines.

**B.    The Craig Memo Expanded White House Control of FOIA Productions.**

37.    The phrase "White House equities" is not defined by OWHC or other authority. *See, e.g.*, Dep't of the Interior, Freedom of Information Act (FOIA) Handbook 45 (July 15, 2014) ("Identifying materials that may have WHE is not always obvious."), *available at* http://goo.gl/tAfU41.  As part of its investigation of White House involvement with agency FOIA practices, CoA Institute requested and obtained documents illustrating how the Craig Memo has been put into practice.

38.    The documents obtained by CoA Institute confirm that the Craig Memo constitutes an expansion of White House review of FOIA productions (and has been understood as such by the agencies).  Specifically, the phrase "White House equities" implies a range of FOIA requests and productions broader than the category of White House-originated documents subject to review

under the Hubbell Memo, or the category of documents where consultation with the White House is necessary to evaluate application of FOIA exemptions.

39.     Because the term "White House equities" is vague and undefined, agency FOIA officers interpret it broadly, referring FOIA requests to White House review whenever the subject matter might be of "interest" to the White House.  *See*, *e.g.*, Ex. 5 (Email from Hirsh Kravitz, DOE, to Edward Siskel, OWHC (Dec. 26, 2012) ("This is another FOIA for review.  There are no white house equities but Susan thought you may want to see it as it involves [REDACTED].")); Ex. 6 (Email from DOD to Mike Gottlieb, OWHC (June 5, 2012) ("There really don't appear to be WH equities within the document being released[.]")); Ex. 7 (Email from Gemma Flamberg, HHS, to Blake Roberts, OWHC (Oct. 18, 2011) ("I don't believe that these are the kinds of records that you need to review, but I figured I would give you the option.")); Ex. 8 (Email from Clarice Julka, DOI, to Edward Keable, DOI (Dec. 14, 2012) ("Six pdf files had joint DOI-White House records that could be interpreted as White House equities.")); Ex. 9 (Consultation Memorandum from Melanie Ann Pustay, DOJ, to Edward Siskel, OWHC (Jan. 30, 2013) ("The attached documents contain information of interest to the White House.")).  To comply with the Craig Memo, agencies have consulted with OWHC over seeming minutiae.  *See* Ex. 10 (Email from Jennifer Lee, DHS, to Jonathan Su, OWHC (Aug. 20, 2012) ("The main WH equity is the biographical information on the attendees [at a meeting between Secretary Janet Napolitano and "Jewish community leaders"].")).  The practical effect of the Craig Memo is therefore to delay production of requested, non-exempt documents.  The President cannot effect by indirection what he cannot do by direct order, *e.g.*, he can neither direct agencies to delay FOIA production nor can he effect such indirectly via a review procedure.

40.     The CoA Institute ongoing investigation of White House interference with agency FOIA processes has revealed several types of requests that agencies and the White House consistently treat as involving White House equities when sought through FOIA.

41.     First, FOIA requests that implicate records that may be of political interest to the White House, even when they do not originate with the White House and where White House review is not necessary to evaluate FOIA exemptions and privileges, are sent to the White House for review.  This practice is followed if the information sought is politically sensitive or potentially embarrassing.  *See, e.g.*, Jeffrey Scott Shapiro, *Worse than Nixon? Obama White House Accused of Hiding Public Information*, Wash. Times, June 30, 2014, http://goo.gl/wurMai.

42.     For example, in 2012, the General Services Administration ("GSA") was widely criticized for its abuse of taxpayer dollars to host "lavish" staff conferences in Las Vegas and elsewhere.  *See, e.g.*, Jim McElhatton, *GSA Scandal widens; dozens of conferences now under investigation*, Wash. Times, Aug. 1, 2012, http://goo.gl/j59oKB.  FOIA requests concerning this scandal were forwarded to OWHC for review, apparently at the direction of the White House.  Ex. 11 (Email from Seth Greenfeld, GSA, to Jonathan Su, OWHC (Apr. 19, 2012)); Ex. 12 (Email from Seth Greenfeld, GSA, to Jonathan Su, OWHC (May 1, 2012) ("Per your request, here are the five FOIA requests that in some manner ask for the 2010 Western Regions Conference website and its contents.")).

43.     Agencies have consulted with OWHC on FOIA requests related to, among other things, bathroom renovations at DOI, Ex. 13 (Email from Seth Greenfeld, GSA, to Jonathan Su, OWHC (Apr. 12, 2013) ("I was told ... that you wanted to see the FOIA about the renovations to

a bathroom at the Department of Interior.”))[2]; documents that included “criticism of GOP-opposition to the Obama Administration,” Ex. 8; and a Fox News FOIA request “re bonuses/awards” at DOD, Ex. 14 (Email from DOD to Andrew Wright, OWHC (Oct. 17, 2012).

44.     Agencies have demonstrated a pattern and practice of sending requests and responsive records to OWHC for review when the records implicate politically charged and newsworthy topics, especially when those FOIA requests originate from members of the media. Ex. 8 (responsive records include “criticism of GOP-opposition to the Obama Administration”); Ex. 14 (Email from the DOD to Andrew Wright, OWHC (Oct. 17, 2012) (“Just a heads up on DoD’s response to Fox News FOIA re bonuses/awards[.]”)); Ex. 15 (Emails from Thomas Hitter, OMB, to Jessica Leinwand, OWHC (Apr. 29 & May 22, 2013) (forwarding request, records, and “corresponding complaint” from Judicial Watch FOIA request for OMB and Treasury records “regarding DOE’s loan guarantee to Solyndra”)).

45.     Second, agencies will frequently forward agency-originated and agency-controlled travel records of high-ranking officials to OWHC for review.  DOT, for example, “consulted” with OWHC on the release of “travel vouchers” used by Secretaries Norman Mineta, Mary Peters, and Ray LaHood.  Ex. 16 (Email from Kathy Ray, DOT, to Russell Anello, OWHC (Mar. 4, 2013)).

46.     This appears to be the situation when the travel in question relates to the President or individuals linked to the President, even when the information sought only implicates “potential White House equities,” “White House related information,” or other such “fairly innocuous” information. Ex. 17 (Emails between DOE and OWHC (Aug. 2012 – Jan. 2013)).  The Department of Labor (“DOL”) even consulted with the White House on records concerning a “community

---

[2] *See also* Gen. Servs. Admin., FOIA Log for Calendar Year 2013 (FOIA Request No. 237108), *available at* http://goo.gl/OFVWlz; *see generally* Stephanie Condon, *Interior Department’s 2007 bathroom renovation cost $222,000*, CBS News, Jan. 16, 2013, http://goo.gl/CL6ZN3.

college bus trip" that Secretary Hilda Solis took with Dr. Jill Biden, Vice President Joe Biden's wife. Ex. 18 (Email from Deborah Greenfield, DOL, to Kathleen Hartnett, OWHC, and Astri Kimball and Laura Hildner, Office of the Vice President (July 2, 2012) (forwarding requests from Judicial Watch and Forward Observer, a veteran-run publication)).

47.    The DHS implementation of "White House equities" review is revealing.   On October 16, 2009, months after the Craig Memo issued, DHS commented that "[White House] Counsel has asked that all FOIA's related to Cabinet members' schedules/travel be sent to their office … for review prior to release due to WH meetings, calls, etc."   Ex. 19 (Amy Shlossman: FOIA requests on the Secretary's Schedule (Oct. 16, 2009)).   To accomplish this, DHS set out "a specific process we will use," which emphasized that "final release to the requesting party" would not occur until the materials were "pass[ed] to WH Counsel's Office" and "WH … pass[ed]" it back to the agency.   *Id.*

48.    Third, requests for the work calendars of agency officials are often subject to White House review.   Ex. 20 (CoA Institute FOIA request to HHS for "access to the work calendars of the Secretary, Deputy Secretary, and Chief of Staff from January 2013 to the present"); Ex. 21 (Email from Seth Grossman, DHS, to Jonathan Su, OWHC (Mar. 7, 2012)).   This is the practice even when the only apparent connection to the White House is that a meeting occurred there or with White House representatives.   Ex. 22 (Email from Deborah Greenfield, DOL, to Kathleen Hartnett, OWHC (Apr. 8, 2013) (concerning a desk calendar entry recording a lunch meeting between former Secretary Hilda Solis and Cecilia Munoz, then-White House Director of Intergovernmental Affairs); Ex. 23 (Email between DOE and OWHC concerning the calendar of Assistant Secretary for Energy Efficiency and Renewable Energy Cathy Zoi (May – June 2010 &

Jan. 2011) ("Each of the selected pages makes a reference to an activity involving the White House, such as attending a meeting there, [REDACTED].")).

49.    The practices of DHS are again illustrative.  Besides documentary evidence that DHS considers "FOIA's related to Cabinet members' schedules" to implicate White House equities, Ex. 19 (Amy Shlossman), at a 2011 hearing before the House Committee on Oversight and Government Reform, Mary Ellen Callahan, then-Chief Privacy Officer for DHS, confirmed that "White House equities" included "the Secretary's calendar to the extent that she was in the White House," and that "anything that has White House equities would require White House review" before being produced under FOIA.  *Why Isn't the Department of Homeland Security Meeting the President's Standard on FOIA?*, *Hearing Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. 33–34 (testimony of Mary Ellen Callahan, Chief Privacy Office, DHS) (commenting that White House equities would cover a "[r]equest to see documents about spending under the $862 billion stimulus law").  As Ms. Callahan testified, submitting such materials for White House FOIA review "is a typical process."  *Id.*

50.    Fourth, agencies have engaged OWHC for "consultation" on documents that refer to "inhabitants" or "employees" of the White House.  *See*, *e.g.*, Dep't of the Interior, Freedom of Information Act (FOIA) Handbook 45 (July 15, 2014) ("A document that refers to the WH or members, inhabitants, or employees of the WH also typically should be flagged as potentially having [White House equities].").  Records that concern the interests of the Vice President and his spouse have been sent to OWHC and the Office of the Vice President for review under the Craig Memo.  Ex. 18; Ex. 24 (Email from DOD to Mike Gottlieb and Jessica Leinwand, OWHC, and Astri Kimball and Laura Hildner, Office of the Vice President (Nov. 15, 2012) ("significant" request concerning congressional correspondence about Air Force Mortuary Affairs Operations)).

The First Lady has "equities" in agency records under the Craig Memo.  Ex. 25 (Email from Mike Gottlieb, OWHC, to Andrew Wright, OWHC (Mar. 14, 2012) ("I believe I have cleared all referred FOIA matters with two exceptions: the First Lady's trip to Spain and 'Date Night.'")).

51.     In fact, documents referring to such individuals before they were at the White House have been treated as involving "White House equities."  In one instance, the Treasury forwarded a FOIA case "involv[ing] correspondence sent by Senator Obama and Senator Biden to the Treasury Department from 2002 to 2007" to OWHC for review.  Ex. 26 (Email from Peter Lee, Treasury, to Edward Siskel, OWHC (Apr. 18, 2012)).  In another, DOJ forwarded records "concerning the attempted extradition of Roman Polanski" to OWHC because the responsive material included emails originating with former DOJ employees Kathryn Ruemmler and Lisa Monaco, who were employed as White House Counsel and Homeland Security Advisor, respectively, at the time of the request.  Ex. 27. (Email from Douglas Hibbard, DOJ, to Jonathan Su, OWHC (Sept. 23, 2013))

52.     Apart from these specific topics, the fact that agencies have received similarly-worded requests may also implicate "White House equities" and require "consultation" with OWHC or other White House components.  *Compare* Ex. 28 (Email from Dan Cruz, GSA, to Matt Lehrich, Assistant Press Sec'y, White House (Jan. 16, 2013) ("Just wanted to flag this for you. Reporter Brad Heath at USA Today has filed a FOIA request for job descriptions of all agency spokesmen[.] … He told me that he has filed the same FOIA request with over 100 federal agencies.")) *with* Ex. 29 (Email from Ramona Romera, USDA, to Russell Anello, OWHC (Nov. 9, 2012) (forwarding FOIA request from *USA Today*'s Brad Heath concerning USDA spokespersons; *see also* Ex. 30 (Email from Preeta Bansal, Gen. Counsel & Senior Pol'y Advisor, Office of Mgmt. & Budget, to "ALL AGENCY GC's" (Aug. 6, 2009) ("Ken Vogel, a POLITICO

reporter, submitted two broad FOIA requests to OMB on [*sic*] July.  We have learned that many other agencies have received similar requests. … [A]s a reminder, to the extent that these requests implicate … White House equities … consult in advance with the White House Counsel, consistent with the [Craig Memo].")).

### C.     The Craig Memo is an Obstacle to Transparency.

53.     The impact of the Craig Memo on the FOIA process has been significant.  FOIA does not provide any additional time for the referenced consultations and/or review which do not serve any legitimate FOIA purpose.  It also inappropriately delays final determinations and production of responsive documents until OWHC grants clearance.  Ex. 31 (Email between Marna McDermott and Joel Beauvais, EPA, and Edward Siskel, OWHC (Sept. – Oct. 2011)); Ex. 32 (Email from Edward Keable, DOI, to Kathleen Hartnett, OWHC (June 1, 2012) ("At the risk of harassing you too much, have you had a chance to review the two Occupy DC documents yet?")).  In many instances, "White House equities" review deprives persons of their statutory right to timely access to agency documents, meaning that requesters wait months, sometimes years, for their requests to be processed.  C.J. Ciaramella, *Report: White House Review Hindering FOIA Releases*, Wash. Free Beacon, Mar. 21, 2014, http://goo.gl/ieQOzG (reporting that the White House held up one journalist's FOIA request for two years); Mark Tapscott, '*Most Transparent' White House ever rewrote the FOIA to suppress politically sensitive docs*, Wash. Examiner, Mar. 18, 2014, http://goo.gl/BWNLWg (same).

54.     For example, on October 26, 2012, DOE forwarded six pages of responsive documents to OWHC for "White House equities" review, asking if "these are cleared for release."  Ex. 17 (Email from Jocelyn Richards, DOE, to Edward Siskel, OWHC (Oct. 26, 2012)).  On November 2, 2012, after receiving "an inquiry regarding the status of this FOIA request," DOE followed up with OWHC, stating that "[o]ur package is ready to go pending your approval of these

six pages." *Id.* As DOE explained, "[t]he pages in question concern Secretary Chu's travel on Air Force One and appear fairly innocuous." *Id.* Despite the "fairly innocuous" nature of the documents (and the fact that they facially did not appear to implicate any White House issue), OWHC did not confirm release of the documents until mid-January 2013, months after OWHC received them from DOE. *Id.*; Ex. 33 (Email from Thomas Hitter, Office of Mgmt. & Budget, to Jonathan Su, OWHC (July 20, 2012) ("I wanted to check in on the status of the documents responsive to the Judicial Watch FOIA request for records pertaining to the health care legislation. Do you think we could be in a position to send that response sometime next week?")).

55.     Because "White House equities" review is directed in particular at FOIA requests that the administration finds politically sensitive or embarrassing, the resulting delays disproportionately affect requests on topics of pressing public importance, where and when interest in prompt disclosure is at its height.

56.     The delay caused by White House interference has been so pronounced that the United States House Committee on Oversight and Government Reform held hearings on FOIA backlogs in 2011 and again in 2015. As the Chairman of the House Oversight Committee, Rep. Jason Chaffetz, remarked during the latest round of hearings, "[t]he heart of the backlog lies in this memo . . . 'The White House equities.' You want to see the bottleneck? Look at the White House …." Josh Gerstein, *Chaffetz blames White House memo for FOIA delays*, Politico, June 2, 2015, http://goo.gl/YrUlBL.

57.     In addition to the delay that results from "White House equities" review, this interference has involved at least one agency — the Department of State — creating computer accounts for White House counsel to access an "online review tool" intended for State employees, so that OWHC might directly review agency records. Ex. 34 (Email from Gene Smilansky, State,

to Jessica Leinwand & Ilona Cohen, OWHC (Aug. 6, 2013) ("Attached are the forms I mentioned, which we will need back as soon as possible in order to create profiles for you in the online review tool.")).

58.     Such broad White House supervision of agency FOIA processes and consequent delays in production of documents are inconsistent with the governing statute.  FOIA requires the prompt production of records to the public unless an enumerated exemption or special record exclusion applies.  There is no such exemption or exclusion for documents that indirectly relate to the White House, for information the White House does not want the public to know concerning a document, or when the White House has political concerns with its release.  The White House has no statutory right to demand review of FOIA productions and thereby delay public access to those documents.

59.     The facts that consultation that delays production is authorized only with "another agency," 5 U.S.C. § 552 (a)(6)(B)(iii)(III), and that the White House is not an "agency" under FOIA, *see*, *e.g.*, *Nat'l Sec. Archive*, 909 F.2d at 545, confirms the limitations imposed on the scope of White House involvement in the review of FOIA productions.  Given that the statute contemplates consultation only with sister agencies, the White House cannot assert a broad supervisory authority that results in violations of statutory FOIA deadlines.

## III.    WHITE HOUSE CONSULTATION HAS ILLEGALLY DELAYED PRODUCTIONS RESPONSIVE TO CAUSE OF ACTION INSTITUTE FOIA REQUESTS

60.     Responses to many CoA Institute FOIA requests have been unlawfully delayed due to unnecessary consultation with the White House.[3]  In some cases, consultation with OWHC over CoA Institute FOIA requests has delayed agency determinations more than a year.

---

[3] CoA Institute is also plaintiff in a multi-agency FOIA lawsuit to compel the production of correspondence between agencies and OWHC as part of "consultation" under the Craig Memo.  *See Cause of Action v. Internal*

A.   **"White House equities" review denies Cause of Action Institute responsive documents.**

61.   For example, on August 6, 2013, CoA Institute submitted a request to Defendant HHS for "access to work calendars of the Secretary, Deputy Secretary, and Chief of Staff from January 2013 to the present."  Ex. 20.   HHS acknowledged the request on August 13, 2013, indicating that the request was "being processed as expeditiously as possible" and might require "consultation with ... other executive branch agencies[.]"  Ex. 35.   After five months elapsed with no response from HHS on the processing of the request, CoA Institute sent a letter to HHS to seek an estimated completion date.  Ex. 36.   Later that month, HHS responded with an interim production of Secretary Kathleen Sebelius's calendars and indicated that other records were still "undergoing review."  Ex. 37.   It appears that HHS was not simply "reviewing" records.  Rather, six months after CoA Institute had submitted its FOIA request, HHS forwarded responsive records to OWHC for review.  Ex. 38 (Email from Gemma Flamberg, HHS, to Jessica Leinwand, OWHC (Feb. 5, 2014) ("FYI- FOIA request for Dep Sec's calendar.")).

62.   CoA Institute has several other pending requests that have been delayed more than a year, in whole or in part, at the insistence of the White House.  Between November 2013 and January 2014, CoA Institute sent several requests to HHS related to the Patient Protection and Affordable Care Act ("PPACA").  CoA Institute requested, among other things, all records related to Early Innovator Grants award by HHS, Ex. 39 (Nov. 1 FOIA Request), as well as "[a]ll records relating to incidents of the unauthorized disclosure of Personally Identifiable Information by: any health insurance exchange created under PPACA," Ex. 40 (Dec. 24, 2013 FOIA Request).

---

*Revenue Serv., et al.*, No. 14-01407 (D.D.C. filed Aug. 18, 2014).  Many of the Agency Defendants in this action were or are defendants in that case.

Although CoA Institute sent follow-up letters regarding these requests, the requests have been pending for more than two years.

63.     In addition, in March 2015, CoA Institute requested documents from the State Department related to the e-mail and text messages of former Secretary of State Hillary Clinton, and her compliance with record preservation laws, while she conducted business on behalf of the State Department.  Ex. 41 (Mar. 4, 2015 FOIA Request).  CoA Institute subsequently sent requests to the William J. Clinton Presidential Library and the National Archives and Records Administration for records evidencing communications with Mrs. Clinton and records concerning compliance with the Federal Records Act.  Exs. 42, 43 (Sept. 14, 2015 & Sept. 22, 2015 FOIA Requests).  CoA Institute did not receive the latter documents timely and had to initiate suit to obtain a production schedule.

64.     The full impact of pre-production review by the White House is difficult to ascertain.  Parties whose FOIA requests implicate White House equities are not informed when their requests are forwarded to the White House, and so they will rarely know that political interference occurred.  It is difficult to determine how many FOIA requests on topics of pressing public importance — the requests where prompt processing is of the essence — are now held up by OWHC.  The potential chilling effect on political speech and government accountability investigations is plain.  The non-public nature of the OWHC process also makes judicial review and correction of the White House policy difficult.

65.     While purporting to allow timely review, the Craig Memo in practice and in fact causes substantial delays, by design or consequence, as implemented.  There is no discretion for the agencies to refuse to follow the Craig Memo in practice.

**B.     The Cause of Action Institute July 29, 2015 Requests**

66.     In addition to the FOIA requests discussed, on July 29, 2015 CoA Institute sent FOIA requests to several agencies.  Exs. 44–54.  Each of those requests sought three types of documents known, based on CoA Institute investigations, to trigger pre-production review by OWHC:

a.     "All travel records of [the agency head or heads] related to travel (1) on Air Force One, (2) with the President or Vice President, or (3) to or from meetings with the President or Vice President outside of Washington, D.C., from January 1, 2014 to the present."

b.     "All work calendars of [the agency head or heads] related to meetings that (1) occurred at the White House or (2) included representatives of the Executive Office of the President, from January 1, 2014 to the present."

c.     "All records of correspondence received by the Office of the Secretary or the Office of Congressional Relations from (1) Senator Barack Obama, or any member of Senator Obama's congressional staff, or (2) Senator Joseph Biden, or any member of Senator Biden's congressional staff, from January 3, 2005 to November 3, 2008."

67.     In each request, CoA Institute requested to be classified as a representative of the news media for fee purposes.  *Id.*

68.     Defendants received those requests, sent CoA Institute acknowledgement letters, and assigned tracking numbers to the requests.  The dates and tracking numbers of outstanding requests whenever sent, are set out in the following table.[4]

---

[4] Elapsed time is measured at the date of this filing.

| Agency | Sent | Received | Tracking Number | Days Overdue (as of 5/9/16) |
|---|---|---|---|---|
| Department of Health & Human Services | 8/6/13 | 8/13/13 | 2013-1157-BK | 2 years, 270 days |
| Department of Health & Human Services | 11/1/13 | 11/19/13 | 110420137013 | 2 years, 172 days |
| Department of Health & Human Services | 12/24/13 | 1/7/14 | 122720137031 | 2 years, 123 days |
| Department of the Interior | 7/29/15 | 7/29/15 | OS-2015-00419 | 285 days |
| Environmental Protection Agency | 7/29/15 | 7/30/15 | EPA-HQ-2015-009428 | 284 days |
| Department of Transportation | 7/29/15 | 7/31/15 | 2015-328 | 283 days |
| Department of Justice | 7/29/15 | 8/3/15 | 15-01563 (F) (AG) 15-05164 (F) (OLA) | 280 days |
| Department of Defense | 7/29/15 | 8/4/15 | 15-F-1589 | 279 days |
| Department of Homeland Security | 7/29/15 | 8/4/25 | 2015-HQFO-00631 | 279 days |
| Department of Energy | 7/29/15 | 8/7/15 | HQ-2015-01689-F | 276 days |
| Internal Revenue Service | 7/29/15 | 8/7/15 | F-15219-0103 | 276 days |
| Department of the Treasury | 7/29/15 | 8/18/15 | 2015-08-042 | 265 days |
| Department of State | 7/29/15 | 9/2/15 | F-2015-12930 | 250 days |

*See* Exs. 37, 39–40, 55–65.

69.     At least one of the acknowledgement letters sent by the Agency Defendants mentions the need for inter-agency consultation, even though it is not apparent that any other agency, let alone the White House, would be necessary to consult to fulfill the FOIA request.  Ex. 61 (DOD: "We will be unable to respond to your request within the FOIA's twenty-day statutory time period as there are unusual circumstances which impact on our ability to quickly process your request [including] the need for consultation with one or more other agencies[.]").

70.     None of the CoA Institute FOIA requests at issue requires production of documents originating with the White House or that contain White House-originated information.  On the contrary, work calendars and travel records originate with the agencies alone; likewise, agency correspondence with then-Senators Obama and Biden does not appear to concern the White House in any way cognizable under FOIA.

71.     None of the Agency Defendants have provided CoA Institute with a final determination.  CoA Institute waited for compliance past the statutory deadlines.  Follow-up letters were sent to every Agency Defendant.

72.     Neither the Agency Defendants nor the White House can use the Craig Memo to create or justify delay in producing requests which delay violates FOIA.

73.     There is no basis for statutory tolling of the agencies' response deadlines in this case.

74.     CoA Institute is not bringing an action on documents that have been delayed a few days or even a month.  For all requests any ten-day statutory extension has long passed.  All requests are therefore outstanding for a significant amount of time.

## CAUSES OF ACTION

### COUNT I
**(Against the Agency Defendants)**
**Violation of FOIA: Failure to Comply with Statutory Deadlines**

75.     CoA Institute realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

76.     FOIA requires that agencies respond to requests within twenty business days or, in "unusual circumstances," within 30 business days.  5 U.S.C. §§ 552(a)(6)(A)–(B).  If an agency requires additional time, FOIA mandates that the agency provide requesters "an opportunity to arrange with the agency an alternative time frame for processing the request[.]"   *Id.* § 552(a)(6)(B)(ii).

77.     Each Agency Defendant has improperly denied access to agency records requested by CoA Institute by failing to make a determination as to the CoA Institute FOIA requests and produce responsive documents within the statutory time limit set forth in 5 U.S.C. §§ 552(a)(6)(A) (B).

78.     The Agency Defendants have failed to comply with their statutory deadlines which is a constructive denial.  CoA Institute has fully exhausted its administrative remedies under 5 U.S.C. § 552(a)(6)(C), and is entitled to immediate judicial review.

79.     HHS has specifically withheld present requests because the documents are being reviewed by the OWHC.  As demonstrated by the allegations in paragraph 61, this long delay is improper and without foundation in law.

80.     The reason, in whole or in part, for the failure of the Agency Defendants to comply with their response deadlines under FOIA is that the CoA Institute requests implicate "White House equities" within the meaning of the Craig Memo.  Rather than completing their FOIA productions independently, the agencies have engaged in a pattern or practice of forwarding many of their responses to pre-production review by OWHC when such review is unnecessary and/or results in delay.  Review by OWHC is a but-for cause of delays in responsive FOIA productions beyond the time required by the agencies' FOIA response queues.

81.     In the alternative, the non-HHS Agency Defendants are delaying for reasons having nothing to do with the Craig Memo and have not sought to consult with the White House on any documents.  In that case, the delay is unsupported even by a proffered representation by the Agency Defendants as to the need for delay.

82.     Because the Agency Defendants and the OWHC may use "White House equities" to delay legitimate FOIA requests, and then produce documents pursuant to such requests when a Complaint is brought, the practice is "capable of repetition, yet evading review."  *Roe v. Wade,* 410 U.S. 113, 125 (1973).

83.     Pre-production review by OWHC that causes violations of FOIA statutory deadlines is *ultra vires*.  This Court should use its authority to enjoin agency practices and

procedures that violate the mandates of FOIA and order the prompt production of all documents delayed by White House review.  *See* 5 U.S.C. § 552(a)(4)(B); *Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).

**COUNT II**
**(Against the Agency Defendants)**
**Violation of APA: Arbitrary and Capricious Conduct**

84.     CoA Institute realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

85.     The APA provides that "a reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" *id.* § 706(2)(C), or that is taken "without observance of procedure required by law," *id.* § 706(2)(D).  Under this standard, an agency must articulate a satisfactory explanation for its action and rely on those factors that Congress intended it to consider.

86.     Agency Defendants' compliance with the Craig Memo is arbitrary, capricious, and contrary to FOIA because the Agency Defendants have no grounds to delay FOIA productions for years at the insistence of the White House for its political convenience.  The Craig Memo is not issued by an agency and is not filling any "gaps" in the statutory scheme of FOIA.

87.     HHS, as alleged in paragraph 61, has indisputably followed the Craig Memo directives rather than FOIA requirements.  Such action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as prohibited by the APA.

88.     Non-HHS Agency Defendants are also complying with the Craig Memo which harms CoA Institute, and also imposes impending future harm on it, because the Craig Memo causes the Agency Defendants to engage in a pattern and practice of delaying FOIA requests due

to White House consultations.  Review by OWHC is a but-for cause of delays in responsive FOIA productions beyond the time required by the agency FOIA response queues.

89.     In the alternative, the non-HHS Agency Defendants are delaying production for reasons having nothing to do with the Craig Memo and have not sought to consult with the White House on any documents.  In that case, the delay is unsupported even by a proffered representation by Agency Defendants as to the cause of the delay.

90.     CoA Institute has no adequate or available administrative remedy; in the alternative, any effort to obtain an administrative remedy would be futile.

91.     CoA Institute has no adequate remedy at law.

92.     Because the Agency Defendants and the OWHC may use "White House equities" to delay legitimate FOIA requests, and then produce when a Complaint is brought, the practice is "capable of repetition, yet evading review."  *Roe*, 410 U.S. at 125.

93.     This Court accordingly should declare that Agency Defendants' compliance with the Craig Memo is unlawful to the extent that it delays compliance with FOIA deadlines and enjoin such conduct.

### COUNT III
### (Against Defendants Eggleston and OWHC)
### Nonstatutory Review of *Ultra Vires* Action

94.     CoA Institute realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

95.     Pursuant to the Craig Memo, Defendants Eggleston and OWHC have required federal agencies to submit their responses to FOIA requests to OWHC for pre-production review when those requests implicate "White House equities."

96.     Defendants Eggleston and OWHC have no authority to require federal agencies to delay production of documents past statutory deadlines.

97.     The reason that the Agency Defendants have failed to timely respond to the CoA Institute requests is that the requests implicate "White House equities," and the agencies have complied with the Craig Memo *ultra vires* directive to submit those requests to OWHC and to delay production until White House review is complete.  This interference with agency FOIA practices violates the response procedures and deadlines established by FOIA, and it deprives CoA Institute and countless others of their statutory right to timely access to agency documents.  Review by OWHC is a but-for cause of delays in responsive FOIA productions beyond the time required by the agency FOIA response queues.

98.     This Court has authority to enjoin *ultra vires* actions by agents and organs of the federal government, even in the absence of express statutory causes of action.  *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974); *see also* Jonathan R. Siegel, *Suing the President: Nonstatutory Review Revisited*, 97 Colum. L. Rev. 1612 (1997).

99.     Because the Agency Defendants and the OWHC may use "White House equities" to delay legitimate FOIA requests, and then produce when a Complaint if brought, the practice is "capable of repetition, yet evading review."  *Roe*, 410 U.S. at 125.

100.    This Court should enjoin Mr. Eggleston and the OWHC from enforcing the Craig Memo through the General Counsel of the agencies to the extent it delays production of documents timely under FOIA.

101.    Enjoining Mr. Eggleston and the OWHC would prevent continuing injury to CoA altogether.

## RELIEF REQUESTED

WHEREFORE, CoA Institute respectfully requests that this Court:

a.      Order HHS to make a final determination and produce the documents requested within 30 days without regard to the Craig Memo and without further waiting for White House review.

b.      Order the non-HHS Agency Defendants to make a final determination and produce the requested documents within 30 days and without further White House review, or in the alternative Order the non-HHS Agency Defendants to produce the requested documents in the event they claim those documents are not subject to the Craig Memo.

c.      Enjoin Mr. Eggleston and the OWHC from delaying in the future the timely production of documents requested under FOIA by direction to the agencies through the Craig Memo or by reference to "White House equities."

d.      Enjoin each Agency Defendant from consulting with OWHC pursuant to the April 15, 2009 Memorandum from Gregory Craig, Counsel to the President, except insofar as consultation does not delay production of documents;

e.      Order each of the Agency Defendants to make a final determination and produce, within 30 days of the date of its Order, all records responsive to the CoA Institute FOIA requests without regard to "White House equities";

f.      Award CoA Institute its costs and reasonable attorney fees incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

g.      Grant such other relief as the Court may deem just and proper.

Dated: May 9, 2016      Respectfully submitted,


*/s/ John J. Vecchione*
_____

Alfred J. Lechner, Jr. (*pro hac vice* pending)
John J. Vecchione
D.C. Bar No. 431764
Daniel Z. Epstein
D.C. Bar No. 1009132
Stephen S. Schwartz
D.C. Bar No. 477947
Ryan P. Mulvey
D.C. Bar No. 1024362

CAUSE OF ACTION INSTITUTE
1875 Eye Street, N.W., Suite 800
Washington, D.C. 20006
(202) 499-4232 (telephone)
(202) 330-5842 (fax)
jlechner@causeofaction.org
john.vecchione@causeofaction.org
daniel.epstein@causeofaction.org
stephen.schwartz@causeofaction.org
ryan.mulvey@causeofaction.org

*Attorneys for Plaintiff*